[No. 34780. *En Banc.* April 21, 1960.]

CLARICE L. WILLIAMS, *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent.*[1]

[1]Reported in 351 P. (2d) 414.

*Durham & Guimont* and *Casey & Pruzan,* for appellant.

*The Attorney General* and *Daniel G. Goodwin, Assistant,* for respondent.

HUNTER, J.—December 16, 1954, Clarice L. Williams petitioned the department of labor and industries for a widow's pension. The petition was denied by the supervisor. The Board of Industrial Insurance Appeals, after hearing the evidence, entered its order denying the relief sought, upon the ground the evidence failed to establish that Albert E. Williams, her husband, died as the result of an industrial injury, as defined by the workmen's compensation act. Her appeal to the superior court resulted in a verdict that her husband had died as the result of an industrial injury. The court granted the department's motion for judgment notwithstanding the verdict, from which Clarice L. Williams appeals.

Although appellant makes six assignments of error, they all relate to the single question of whether the court erred in granting the respondent's motion for judgment notwithstanding the verdict.

The trial judge submitted the following instructions to the jury without any exceptions being taken thereto:

Instruction No. 11: "Injury is defined by law as: 'Injury means a sudden and tangible happening of a traumatic nature producing immediate or prompt result and occurring from without and such physical condition as results therefrom.' It is not the intent of this law to allow compensation for every death occurring while a workman is engaged in the course of his employment, but rather to cover only those deaths resulting from industrial injuries. In order to prove that Mr. Williams sustained an industrial injury, plaintiff must establish one single definite and particular happening which can be fixed in point of time, and, further, she must establish that Mr. Williams' death resulted from such happening.

"Unless you find from a fair preponderance of the evidence that Mr. Williams sustained an industrial injury and that his death resulted therefrom, you will find for the defendants."

Instruction No. 13: "You are instructed that the burden of proof is on the plaintiff to establish by competent medical testimony that Mr. Williams' death was caused by some incident of strenuous or unusual exertion which occurred dur-

ing his work on the morning of September 22, 1954, and that but for this strenuous or unusual exertion, Mr. Williams would not have died for an indefinite and unpredictable period of time."

Because both of the foregoing instructions were given by the court without exceptions being taken thereto they become the law of this case. *Schneider v. Noel*, 23 Wn. (2d) 388, 160 P. (2d) 1002 (1945).

The issue raised by the appellant, therefore, is whether, under the law of the case as set forth in the quoted instructions, there is sufficient evidence in the record to support the jury's verdict.

The record discloses that Albert E. Williams, who was nearly sixty-one years of age at the time of his death, September 29, 1954, had been an employee of the Stimson Mill Company for approximately twenty-five years; that for more than ten years preceding his death as a millwright his duties included changing the saw blades on the sawdust machine once each week, or more often if needed; that he was a strong man, weighing approximately two hundred pounds, five feet seven inches tall, and accustomed to heavy work; that in June of 1953 it was determined by his doctor that he had contracted a coronary artery disease with arteriosclerosis, and that he was under treatment for that condition until September 25, 1953.

Williams' usual daily working hours were from eight a. m. to five p. m. When he was to change the saw blades, he reported for work an hour earlier since the process required one hour.

The sawdust machine was approximately three feet in height. Changing the saw blades required removing four bolts, prying the bearing off the shaft, removing sixteen saw blades and sixteen collars and replacing them with sixteen sharpened saws and the collars, raising the bearing assembly approximately fifteen inches onto the shaft, and bolting it in place. The bearing and housing weighed one hundred fifty-one pounds and could be placed on the shaft by the methods we will refer to below.

Appellant contends her husband suffered a heart attack resulting in his death by reason of strenuous or unusual exertion in changing the saws on the morning of September 22, 1954.

To come within the rule of the quoted instructions, the evidence must establish (1) that the decedent changed the saw blades on the morning in question (2) that as a consequence of overexertion he suffered a heart attack from which he died. The record discloses that on the evening of September 21, 1954, Williams' foreman told him to replace the saw blades the next morning. Williams left home in time to arrive for work at seven a. m. A fellow worker saw him in the millwright room at approximately seven-thirty a. m. Another employee saw him coming down the steps at approximately eight a. m. Williams told the latter that he did not feel well. Two other employees saw Williams at approximately eight-ten a. m. One stated that Williams was pale and walked slowly; the other stated that he looked "white as paper" and that Williams said he did not feel well; that he "couldn't get his wind" and that he was going to sit down and rest. Williams drove home, arriving at eight-thirty a. m. He staggered up the steps and his wife helped him into the house. His hands were dirty and his work clothes soiled. He complained of pain in his chest. His wife asked him how it happened, and "he just said he had been changing saws."

Appellant's testimony with reference to the alleged overexertion follows:

"Q. You asked your husband what happened? A. I did. . . . Q. What did he say happened? . . . Well, he said that he hurt in here (indicating). Q. Pointing to his chest? A. In his chest and he kept his hand up there. In fact, had both hands up there. Q. Did you ask him how it happened? A. I did. . . . Q. Did he say how it happened? A. No, he just said he had been changing saws, as I took it—saws and blades in his work like he always done."

From the evidence the jury could have reasonably concluded that Williams *actually did change the saw blades* on the morning in question. It was one of his duties; he had

been ordered to do the work; other workmen saw him coming down the stairs from the saw room; his hands and clothes were dirty; and he told his wife that the attack occurred while he was changing the blades.

■ The respondent argues, however, that the circumstantial evidence is insufficient to show that Williams reached the point in changing the saw blades requiring the strenuous exertion of placing the bearing on the shaft; that it is as reasonable to conclude from the evidence that he may not have reached this point of the replacement of the bearing and that the job was not completed. Therefore, under the rule of *Arnold v. Sanstol*, 43 Wn. (2d) 94, 260 P. (2d) 327 (1953), the circumstantial evidence is insufficient to establish the first element for appellant's recovery. We disagree.

The record discloses that superintendent H. A. Yorkston testified he knew the blades had been changed on the morning in question. Moreover, there is an absence of any evidence in the record that it was necessary for other employees to complete the job. There is a further absence of any evidence of the decedent having notified his employer that he had failed to complete the performance of his duty. This would justify the jury in reasonably concluding the job had been completed and that the task was performed by Williams before he left the premises that morning.

■ The second contention essential for the appellant to recover under the quoted instructions requires that the method pursued by Williams in changing the saw blades involved strenuous or unusual exertion precipitating a heart attack which resulted in his death. Whether the method employed in performing this duty was strenuous is best gleaned from the following excerpts taken from the record.

Mr. H. A. Yorkston testified as follows:

" . . . Q. Did you ever remove any of those saw blades yourself? A. No. Q. Would you be able to tell us whether it was a difficult task to remove those? A. Well, I would say this, it would depend a lot on how it was done. . . . Q. As to whether it was difficult? A. That is right. . . .

Q. Is that in respect to the awkwardness of getting to it and the like? A. Well, I would say it would be,— the bearing itself is with the plate—is perhaps, oh, I would say, in the neighborhood of 18 inches in length, and it would be possible to lift one end of the bearing up and start it on the shaft without lifting the entire— Q. Weight? A. Weight. Q. Yes. A. (continuing) And then after this bearing is taken off, the shaft itself drops down, oh, I would say, maybe a couple of inches— Q. Yes. A. —and it is *necessary to line that shaft up with the bearing in order to get it back in place and, of course, again stating that the easy way to do it would be to put a rope on it*— Q. Or some— A. —pulley and take the weight off it and slip the bearing on. The hard way to do it would be to do it manually, lift the bearing up and put it on there and, *perhaps, lift the shaft and all.* Q. What would be the combined weight of the bearing and shaft? A. I couldn't answer that because it is a, perhaps, a matter of the saws, and the collars, and shaft and, of course, it is held by a bearing over on the other end. Q. It would be a very considerable weight? A. It would be very difficult to ascertain what it would amount to altogether, but, again I say, I just don't know how different ones would do it. There is an easy way to do it. Q. There always is. It would be considerably heavier than 150 pounds, in your opinion, the combined— A. *They use a bar. I don't think it would be humanly possible to put the bearing on it without using a bar or something to raise that up.* Q. *In doing that a man would be performing strenuous work, would he not? A. Well, again I say it depends upon how he done it. . . . Q. What do you mean by 'hard way?' A. By not utilizing— Q. Ropes and pulleys and so forth? A.—facilities which are there to be used.* Q. Would you know whether or not there were any pulleys that were usable at the time there? A. All I could say in that connection is that there is a wire rope strap over a timber which extends down within, say, six feet of this machine whereby a rope could be put around the arbor and with the assistance of what we call a 'come along' that are available to all the mechanics, it would be then not strenuous as far as strength is concerned. Q. In other words, it would act as a fulcrum or pulley? A. Yes, *it would take the weight of the shaft off* and be a matter of placing the bearing on the shaft and sliding back your— . . . Q. Is the cable strap held by a hook? A. No, just draped over the timber. Q. *Do you know whether or not it was in a shape so it could be used? A. At the time he became sick? Q. Yes. A. I couldn't answer that. Q. Because*

*you don't know? A. I don't know. It has been there—to my knowledge it has been there all the time. . . .*" (Italics ours.)

Mr. Clinton Halladay, who changed the saw blades in cases of emergencies, testified:

"Q. Mr. Halladay when you changed the blades, you used a pryer bar? A. That is right. Q. Why did you use a pry bar? A. I don't know. Q. *Was it possible to change the blades without using a pryer bar? A. Not for me it wasn't. Q. Was it a heavy job? A. Rather.* Q. If there had been a pulley there, would you have used a pulley rather than a pryer bar? A. I can't say because under the conditions it might not have been handy because it would depend on how it was rigged or what. . . ." (Italics ours.)

Mr. Glenn Wilson, a mechanic, testified:

"Q. Then how do you put it back upon the shaft? A. the way I put it, lift the one end up on the bracket that sticks out, rest it there, then I lift the other end and slide it on. Q. And you did that by hand? A. I done that by hand. Q. *Was there any other means of doing it? A. Well, if they wanted to get chain, blocks from down below they could use them and put it on if they wanted to. Q. Did you see any of them do that? A. Oh, no.* . . . Q. *Were you at the plant the morning that Mr. Williams had to leave? A. I was there that morning.* . . . Q. *Now, did you on that morning, or any other time, observe any chain or pulleys, block and tackles being utilized there at the place where the sawdust machine saws were changed.* . . . Q. *I will just ask if you observed it that morning?* . . . A. *No.* . . ." (Italics ours.)

The foregoing testimony would justify the jury in concluding that the placement of the one hundred fifty-one pound bearing and housing on the shaft, even with the assistance of a pry bar, would involve strenuous physical exertion and would not be the easier method of performing the task. The jury would have been further justified in believing that the wire rope strap, which Yorkston testified could be used with a "come along," was not available to Williams, and if available, would be of assistance only in lining up the shaft and bearing *after the bearing and housing had been placed thereon*; that in order for Williams to pursue

the easier method of placing the bearing and housing upon the shaft, it would have been necessary to have the facilities of a block and chain, which were not available for that purpose. The jury could have drawn the only fair and reasonable conclusion therefrom, that a strenuous method was employed; thereby establishing the second element of proof essential to appellant's recovery against the respondent under the act.

■ Respondent argues, however, that the facts in the hypothetical questions submitted to the medical witness, wherein it was determined the death of Williams resulted from overexertion, are not supported by the record. The record discloses the hypothetical question assumes that Williams lifted a weight of one hundred fifty to two hundred pounds, constituting the overexertion of the decedent at the time of changing the saw blades. It is true that the record does not necessarily disclose that the weight lifted by Williams in the replacement of the bearing and housing was one hundred fifty to two hundred pounds; however, the record is clear that the method employed constituted strenuous or unusual exertion, coming within the requirements of instruction No. 13. Moreover, the answer of the medical witness clearly shows that the coronary occlusion was a result of overexertion, which would follow whether the decedent lifted one hundred fifty-one pounds or a lesser weight as long as the method employed in changing the saw blades involved strenuous or unusual exertion.

We are satisfied from the record there is substantial evidence to justify the jury in finding, under the law of the case set forth in the quoted instructions, that the decedent sustained an industrial injury caused by strenuous or unusual exertion. The trial court, therefore, erred in granting the respondent's motion for judgment notwithstanding the verdict. The judgment of the trial court is reversed, and the cause is remanded with instructions that the verdict of the jury be reinstated.

WEAVER, C. J., HILL, FINLEY, ROSELLINI, and FOSTER, JJ., concur.

OTT, J. (dissenting)—I dissent for the reasons expressed in the majority opinion of this court, filed September 17, 1959, following the first *en banc* hearing, and reported in 343 P. (2d) 1028.

MALLERY and DONWORTH, JJ., concur with OTT, J.